IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DARLA RUTHERFORD          )
                          )
v.                        )    No. 3:06-0483
                          )    Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION    )


To: The Honorable John T. Nixon, Senior Judge


**REPORT AND RECOMMENDATION**

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g)
and 1383(c), to obtain judicial review of the final decision of
the Commissioner of Social Security denying, in part, plaintiff's
application for supplemental security income ("SSI") benefits, as
provided under Title XVI of the Social Security Act ("the Act"),
as amended. The case is currently pending on plaintiff's motion
for judgment on the administrative record and supporting
memorandum (Docket Entry Nos. 20, 21), to which defendant has
responded (Docket Entry No. 26). In further support of her
motion, plaintiff has filed a reply (Docket Entry No. 29) to
defendant's response. Upon consideration of these papers and the
transcript of the administrative record, and for the reasons
given below, the undersigned recommends that plaintiff's motion
be **GRANTED**, and that the decision of the Commissioner be **REVERSED**
and the cause **REMANDED** for an immediate award of benefits.

1

## I. Introduction

Plaintiff, Ms. Darla Rutherford, protectively filed her SSI application on February 16, 1999, alleging that she became disabled on October 1, 1998, due to multiple sclerosis ("MS") and migraine headaches (Tr. 69-72, 81, 713). After her application was denied at the initial and reconsideration stages of agency review (Tr. 37-48), plaintiff secured the services of her current counsel and requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ hearing was held on October 4, 2000 (Tr. 709-732), and testimony was received from plaintiff and her mother, Ms. Rosalind Canada. The ALJ issued a written decision adverse to plaintiff on May 24, 2001 (Tr. 369-78), ruling that her efforts to home-school her three children constituted substantial gainful activity precluding any award of benefits. Upon plaintiff's request for review, the agency's Appeals Council vacated this ALJ decision and remanded for further consideration (Tr. 394-96). On August 5, 2003, a second hearing was held before the ALJ, and testimony was again received from plaintiff and her mother, as well as a vocational expert ("VE") (Tr. 733-73). The ALJ took the case under advisement until December 23, 2003, when he issued a second written decision that was partially favorable to plaintiff, finding her disabled as of September 6, 2001 -- the day of her psychiatric hospitalization -- but not before (Tr. 17-30). The decision contains the following

2

enumerated findings:

1. The claimant has never participated in substantial gainful activity.

2. The claimant has the following severe impairments: migraine headaches, chronic obstructive pulmonary disease, and a depressive disorder.

3. The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's assertions concerning her ability to work are credible for the period since September 2001.

5. Prior to September 2001, the claimant retained the physical residual functional capacity to perform a full range of medium work activity, which included the ability to lift and/or carry 25 pounds frequently and 50 pounds occasionally; sit, stand, or walk about 6 hours in an 8 hour workday; frequently climb, balance, bend, stoop, kneel, crouch, crawl, push, pull, or reach. Prior to September 2001, there were moderate limitations in the ability to maintain concentration, persistence, and pace for extended periods; and mild limitations in the ability to interact appropriately with the general public, supervisors, and coworkers.

6. The claimant has no past relevant work.

7. The claimant is a younger individual aged 18-44.

8. The claimant has a general educational development certificate.

9. The claimant has no vocational skills that are transferable to other work.

10. Prior to September 2001, considering the claimant's age, education, and work experience, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs are listed above.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time prior to September 2001 (20 CFR § 416.920(f)).

3

12.  As of September 2001, the claimant retains the physical
     residual functional capacity to perform medium work
     activity, which includes the ability to lift and/or
     carry 25 pounds frequently and 50 pounds occasionally;
     sit, stand, or walk about 6 hours in an 8 hour workday;
     frequently climb, balance, bend, stoop, kneel, crouch,
     crawl, push, pull, or reach; with additional
     limitations of avoid exposure to temperature extremes,
     humidity, fumes, odors, dusts, gases, and poor
     ventilation.  However, with regard to mental residual
     functional capacity since September 2001, the claimant
     has been unable to perform the basic mental demands or
     competitive, remunerative, unskilled work on a
     sustained basis.

13.  As of September 2001, based on the inability to perform
     the basic mental demands of competitive, remunerative,
     unskilled work on a sustained basis, and considering
     her age, education, and work experience, the claimant
     cannot make an adjustment to any work that exists in
     significant numbers in the national economy.

14.  The claimant has been under a disability, as defined in
     the Social Security Act, since September 6, 2001 (20
     CFR § 416.920(f)).

(Tr. 28-29)

     On March 16, 2001, the Appeals Council denied plaintiff's

request for review of the unfavorable portion of the ALJ's

decision (Tr. 8-10), thereby rendering that decision the final

decision of the Commissioner.  This civil action was thereafter

timely filed, and the Court has jurisdiction.  42 U.S.C. §§

405(g), 1383(c).  If the Commissioner's findings are supported by

substantial evidence, based on the record as a whole, then these

findings are conclusive.  Id.

4

## II.  Review of the Record

Plaintiff's counsel exhaustively briefed the facts in this case, and his recitation is set forth below, nearly verbatim.

### A.  Ms. Rutherford's Vocational Factors: Age, Education and Work Experience.

Ms. Rutherford was born on 2/3/68, and thus was 30 years old when she filed her SSI claim on 2/16/99. (Tr. 69). She did not complete high school, but did obtain a GED. (Tr. 87, 358, 199). She attended Nashville Tech for less than one year. (Tr. 81, 200, 358). She has no past relevant work history. (Tr. 96-103, 82, 358, 200).

### B. Ms. Rutherford's Social and Medical History.

Ms. Rutherford suffered extensive physical, sexual and emotional abuse as a child. She was molested at age 6 by neighbors, and age 15 or at 16 by another neighbor until she ran away a year or two later. (Tr. 464, 417). Her "parents were physically and verbally abusive to her throughout her formative years"; her alcoholic father "burned (her) with cigarettes at age 7 or 8." (Tr. 357-58, 464). When undergoing a psychological evaluation in February 2001, Ms. Rutherford "displayed scars on her arm that she stated were from cigarette burns apparently inflicted by her father." (Tr. 358). She ran away from home in high school, and this "resulted in multiple group home placements

5

and a stay in a foster care placement." (Id.) She was "sexually assaulted by another female foster child during this stay." (Id.)

Ms. Rutherford was "married and pregnant when she was 18 years old" to a man who was "physically abusive." (Tr. 200). Their child, a daughter named Amanda, was born in 1986. (Tr. 350, 757). A second daughter, Shannon, was born in 1988, and a son, Anthony, in 1989. (Id.) In approximately 1994, Amanda (age 7 or 8) was raped by a acquaintance, and the family received in-home counseling services for several months through the Department of Human Services (DHS). (Tr. 358). Shannon was diagnosed with generalized grand mal seizures, for which she was not receiving treatment. (Tr. 357). "One of the sisters is suffering from bipolar disorder." (Tr. 417). Anthony was diagnosed with developmental delay, attention deficit/hyperactivity disorder and oppositional defiant disorder. (Tr. 357, 200). In June 1999, Ms. Rutherford noted that "he has been going through stage of wanting to kill animals and to kill himself" but was not "currently (being) seen by any professional." (Tr. 200).

Ms. Rutherford's marriage ended after five years. (Tr. 200). She married her second husband in 1996. (Tr. 201). She described him as "disabled for psychiatric reasons" and as having "had an abusive style with her and the children." (Tr. 200-01). They separated in July 1998 when he "physically assaulted her oldest

6

daughter while on a family vacation in Florida." (Tr. 357). She then returned with her children to Tennessee and "has not communicated with him since that time." (Id.)

After she separated from her second husband in 7/98, Ms. Rutherford's household income was limited to her son's SSI check, food stamps and $186 in AFDC benefits per month. (Tr. 719, 70, 358). She and her three children were living in three rooms of a 9-room house owned by her parents. (Tr. 357–58). They had been attempting to remodel the remaining rooms, and were all sharing one large bedroom "with the two girls sleeping in the large walk-in closet." (Id.)

On 10/17/98, Ms. Rutherford was treated at the Horizon Medical Center ER for a severe headache. (Tr. 294–95). She related that she had had the headache for two months and it had been gradually getting worse. (Id.) She was treated with injections of Demerol, Phenergan, and Toradol. (Id.) She was given a prescription for Lorcet 7.5 mg. (Tr. 295).

Ms. Rutherford sought follow-up care at the Horizon Medical Group (HMG) on 10/19/98 and 10/20/98. (Tr. 333). The CT Scan on 10/19/98 of her head identified no abnormality. (Tr. 340). Her doctor at HMG, Rolland Luplow, M.D., assessed her as having a "headache, continuous for the past four days with some photophobia, but no nausea, vomiting or visual symptoms." (Tr. 334). He prescribed Vistaril, Imitrex nasal spray, and Compazine

7

suppositories to be used as needed. (Id.)

Less than one week later, on 10/26/98, Ms. Rutherford was "found semi-responsive at home" and transported to the Horizon ER by ambulance. (Tr. 153-54, 296-303). The diagnosis was "otitis media; near syncopal episode." (Id.)

By referral of Dr. Luplow, Ms. Rutherford underwent a neurologic evaluation by David R. Uskavitch, M.D. on 10/30/98. (Tr. 132-33). Dr. Uskavitch recorded her description of her headache as follows:

> She has evolved a chronic daily headache pattern over the last three months. The headache has features of both tension-type headache and vascular-type migraine headache. In recent weeks, she has had the development of motion-type dizziness with blurred vision and intermittent numbness and paresthesias of the toes and fingers. Her headache is generally a left hemicrania. The headache has not been responsive to NSAIDS or narcotics. She tells me that a cranial CT scan was unremarkable.

(Tr. 132) Dr. Uskavitch diagnosed "intractable migraine headache," and gave her an injection of DHE 45 and Droperidol. (Id.) Ms. Rutherford reported an 80% reduction in the intensity of her headache afterward. (Id.) Dr. Uskavitch also ordered an MRI scan of the brain, prescribed Amitriptyline for headache stabilization and to help her with her trouble sleeping, and prescribed Antivert to treat her vertigo. (Id.)

The brain MRI report of 10/30/98 documented "multiple bilateral cerebral central and subcortical white matter lesions" which were thought to be "most compatible with demyelinating

8

disease." (Tr. 139).

On 11/10/98, Ms. Rutherford called Dr. Uskavitch to report that she was still having headaches and was still unable to sleep. (Tr. 131). Dr. Uskavitch increased her Elavil (Amitriptyline) dosage. Ms. Rutherford called him again 6 days later on 11/16/98 to report that she was still having bad headaches, although she was "sleeping some better." (Id.) Dr. Uskavitch again increased her Elavil dosage. (Id.)

Ms. Rutherford saw Dr. Uskavitch for a follow-up evaluation on 11/20/98. (Tr. 130). She reported that she "still had continued headache and trouble sleeping despite Amitriptyline 150 mg at bedtime." (Id.) Dr. Uskavitch decided to switch her to a comparable dose of Impramine. (Id.) He performed a lumbar puncture to obtain and study her spinal fluid, and also performed Visual, Median Somatosensory, and Brain Stem Auditory Evoked Response testing. (Tr. 130, 135-37). The results of all of the evoked response tests were normal. (Tr. 135-37).

Dr. Uskavitch next saw her on 12/1/98. (Tr. 120). He noted that her "spinal fluid studies showed no evidence of inflammatory change and oligoclonal bands were negative," that her "evoked potential studies were unremarkable," and that her "ANA was negative." (Id.) He opined that "her MRI scan is consistent with the diagnosis of multiple sclerosis which makes her chronic headache syndrome atypical." (Id.)

9

When Dr. Uskavitch next saw her on 1/5/99, he noted that her
"left hemicrania is unchanged" and that she "had no clinical
response to trials of Imipramine and more recently Doxepin." (Tr.
126). He stated that he would "like her to stop her tricyclic
agent and try Depakote 250 mg twice daily for headache
stabilization." (Id.) He noted that although her MRI scan had
suggested a demyelinating process, she had "not had a clinical
pattern of relapsing attacks that would allow a definite
diagnosis of multiple sclerosis." (Id.)

Ms. Rutherford had a reaction to the Depakote, developing a
rash over her entire body shortly after starting it. (Tr. 127).

When she filed for SSI on 2/16/99, Ms. Rutherford completed
a Disability Report. (Tr. 80-89). She identified her medical
conditions as "multiple sclerosis; migraine headaches; urine and
bowel disfunction (sic); blurred vision; weakness; numbness in
limbs; memory loss." (Tr. 81). She completed a Pain Questionnaire
for the Disability Determination Services (DDS) on 4/17/99. (Tr.
104-07). In the space provided for describing her current daily
activities, Ms. Rutherford wrote:

> Walking is fine unless I am dizzy or my muscles are
> weak at the time. I get tired pretty easy. Shopping is
> limited because I tire easily. Household chores depend
on how I am feeling at the time and spread out over the day so I
don't tire out and not get any of them done . . . Socializing has
almost come to a complete stop due to the fact that I have a hard
time getting to the places or houses and when I do get there I am
usually tired and ready to go home. All of the above are not
possible when headaches are strong like migraine headaches.

(Tr. 106). She also wrote that "None of the medicines have relieved the pain so far." (Tr. 105).

Ms. Rutherford returned to see Dr. Luplow on 4/14/99. (Tr. 330). She reported having a "headache constantly since October." (Id.) Dr. Luplow listed her medications as being Depakote, Meclozine, Lortab and Naprosyn. (Id.) Dr. Luplow prescribed an anti-depressant, Paxil. (Id.) Ms. Rutherford returned to Dr. Uskavitch's office two days later on 4/16/99. (Tr. 230). Dr. Uskavitch noted that she continued to have "persistent left hemicrania which I have not been able to help." (Id.) He specifically noted that "Depakote was of no benefit," and he decided to "stop her Imipramine and try Paxil" as Dr. Luplow had suggested. (Id.) He noted that she had "increased urinary frequency and nocturia" and that he suspected that she had a spastic bladder. (Id.) He also noted that she had "recently had some back and left proximal leg discomfort." (Id.)

On 5/25/99, Ms. Rutherford was treated at the Horizon ER for a severe, stabbing left-sided headache with photophobia and nausea. (Tr. 148-49). Ms. Rutherford reported having headaches on and off since October. (Tr. 151). Dr. Uskavitch was called and he reported that "She has these headaches for 6 months," and asked to see her the following morning. (Tr. 149).

By referral of DDS, Ms. Rutherford underwent a consultative evaluation by Donita Keown, M.D. of 6/7/99. (Tr. 194-96). Ms.

11

Rutherford's description of her headaches was recorded as follows in Dr. Keown's report:

> Ms. Rutherford is a 31-year-old white female who seeks
> disability based on a history of multiple sclerosis,
> headache pain, blurred vision and memory loss. Ms.
> Rutherford was diagnosed with multiple sclerosis in January of 1999. S
> specific therapies for multiple sclerosis but reports
> constant
> headaches since October of 1998 during which she has
> sharp pains in the left hip with no associated nausea
> or vomiting but occasional photophobia and left eye
> blurring. She notes that because of her headache pain
> she has poor concentration and names that as her main
> problem keeping her from attaining and maintaining
> employment. She also complains of discomfort in the
> musculature of both thighs and calves which is
> occasional and made worse with exertion. She has no
> history of spinal injury. She reports cognitive decline
> however during examination was able to recall dates,
> times, medications, physician's names and showed no
> evidence of true cognitive impairment.

(Tr. 194).

Dr. Keown described Ms. Rutherford as a "healthy appearing white female" who showed "no difficulty ambulating," "no evidence of speech, hearing or cognitive deficits," "no evidence of spasticity in the extremities," and "no evidence of poor balance, impairment with station or gait or cognitive decline." (Tr. 195-96). Dr. Keown opined that Ms. Rutherford's "headache pain description is inconsistent with common or classical migraine." (Tr. 196). She further opined that "With regard to her presentation, she could sit, stand or walk at least six hours in an eight hour day, could routinely lift fifteen pounds, episodically lift thirty pounds." (Id.). Dr. Keown did not

12

diagnose Ms. Rutherford as suffering from any medical condition or impairment whatsoever. (Tr. 194-96).

By referral of DDS, Ms. Rutherford underwent a consultative psychological evaluation by Scott J. Gale, Ed.D. on 6/18/99. (Tr. 197-201). Dr. Gale begins his report with the statement that Ms. Rutherford "was seen on this one occasion only. The results are thus limited to the current presentation and should be used in conjunction with all available data." (Tr. 197). Dr. Gale records Ms. Rutherford as "Explain(ing) that she is disabled principally due to four conditions:

> 1.  Memory loss, 'like I had to tell mom about this appointment or I'd forget and I look up at 4:30 and think I should be doing something an hour later, I'm hungry and realize I should have been making my dinner.'
> 2.  Headaches.
> 3.  Incontinence.
> 4.  Muscle cramps and weakness.

(Id.) Ms. Rutherford elaborated that she was not sure if she had MS or not, noting that:

> . . . 'it depends on the exacerbation that is all going on at the same time. Sometimes I'm up and about and sometimes I'm in bed all day for weeks at a time - like in October I was in bed almost a month - headaches, dizzy and if I sit up I half sit up and my body doesn't want to get up.' She explained that her trouble began in October of 1998. She realized that she had noticed a few difficulties the year before (1977) like her hands beginning to cramp, legs cramping and a sense that something was in her eye. In October of 1998, the headaches became very bad and if she would pick up a pan and with her wrist she found that she would easily let it go by mistake. She finds that she will have to call her mother and ask her to make things that she previously knew how to do like making gravy. This

13

happens frequently and she finds herself going, 'I know
how to do this but can't.' She also noted that she will
get a 'weird taste in my mouth and one week later I
will get a headache.'

(Id.) Later in his report, Dr. Gale recorded Ms. Rutherford's

description of her medical conditions and problems as follows:

> She notes that she has had some episodes of feeling
> depressed that lasts (sic) for 2 or 3 days at a time.
> She has never had a period of depression lasting two
> weeks at a time. During these days when she feels
> depressed, she will have poor appetite, loss of
> interest, sleep disturbance, fatigue, weight loss and
> loss of libido. . . . She notes that she is frequently
> apprehensive. She is terrified by storms. She reports
> no physical symptoms of anxiety and describes the
> anxiety as a mild problem. . . . She notes sometimes
> coping with compulsive symptoms such as counting — for
> example, counting the lines on a road. She notes that
> this is not a problem. She worries about the effects of
> the Y2K problem. She explains that she is phobic to
> snakes and spiders. . . . She notes that she has heard
> some noises such as the door slamming or a car running.
> She has had disturbance of consciousness that appears
> to be some type of syncopal spells when she will get
> dizzy.
>
> . . .
>
> She has been treated for low back pain, pulmonary
> problems, multiple sclerosis, headaches,
> urination problems, dizziness, and fainting. She noted
> that she shattered her coccyx as a cheerleader when she
> was a teenager. She believes that she should be treated
> for difficulty breathing, dizziness, loss of
> consciousness, pain, stomach problems, vision problems,
> and sequelae of MS exacerbations. She smokes less than
> a pack of cigarettes per day and has smoked since she
> was 16-years-old living at the group home. She does not
> drink alcohol. She has not suffered any roll
> impairments due to alcohol use. She does not use
> illegal drugs. She notes that she has recently lost
> weight due to loss of appetite. She complained of
> trouble getting to sleep, difficulty staying asleep
> because she wakes up a lot at night and is restless.
> She complained of early morning awakening. She

14

estimated that she has been getting by on three hours
sleep per day for the last several months.

(Tr. 198-200). Dr. Gale recorded her daily activities as getting
out of bed between 6 and 6:30 a.m.; sleeping in a T-shirt and
shorts "because otherwise she will forget to get dressed";
brushing her teeth once every 3 days; bathing every other day
(due to the lack of "enough hot water for everyone in the family
to take a bath the same day"); cooking "sometimes" (her two
daughters "will cook sometimes and oftentimes her daughters will
just eat cereal"); using only three rooms of the house because it
was in such "great disrepair"; home-schooling her children under
the directorship of Gateway Christian Schools ("They will do
Bible reading for a hour to an hour and a half when they first
wake up. Then she directs all three children in an hour of
mathematics study. She continues on with various home-schooling
activities with a break for lunch at noon and a 15-minute play
break in the afternoon. They finish between 4:30 and 5. Then the
children must get their chores done."); "Only drive(ing) her car
locally as she may pass out"; doing her own grocery shopping and
shopping at Wal-Mart; maintaining a checking account; paying most
of her bills at the bank while mailing some bills such as her
phone bill; and having "one male friend who visits frequently and
. . . a few other friends that she does not see as often." (Tr.
198).

Dr. Gale described Ms. Rutherford as appearing in

15

practically all regards as normal and unaffected by any mental illness or distress. (Tr. 198 – 199). Dr. Gale's "Diagnostic Impression" reads as follows:

> She does not meet criteria for major depression as she denies a two week episode of being depressed. She is treated with Paxil as well as a long list of medications from Dr. Uskavitch (?) and Dr. Luplow (?). She reports episodic cognitive dyscontrol and memory loss that may be related to the MS. For the present purposes then diagnostic impressions include: Cognitive disorder, NOS, secondary to MS and dysthymic disorder. Her difficulties are reportedly, more physical in nature. Sh to successfully perform as a home-schooling teacher. She gathers curriculum and organizes and teaches her three children. She is able to understand and follow directions. She should be able to interact appropriately in social situations.

(Tr. 201).

A doctor at DDS, Frank Edwards, Ph.D., reviewed Dr. Gale's report and then completed a "Psychiatric Review Technique" form on 7/9/99 in which he opined that Ms. Rutherford's mental impairment was "not severe." (Tr. 212–220). Dr. Edwards identified her "non-severe" mental impairments as "cognitive disorder not otherwise specified, secondary to MS (rule out)" and "dysthymia disorder." (Tr. 214–15). His discussion about these impairments reads as follows:

> 31 year old female alleges memory loss. Has diagnosis of MS. May be showing some cognitive loss secondary to MS but actually shows little problem as she continues to home-school her children, drives, shops, *etc*. Capable.

(Tr. 213) Dr. Edwards opined that Ms. Rutherford's non-severe mental conditions caused only slight restriction of ADL's and

16

slight difficulties in maintaining social functioning, seldom caused deficiencies in concentration, persistence or pace, and never caused episodes of deterioration or decompensation in work or work-like settings. (Tr. 219).

Ms. Rutherford was treated for a urinary tract infection on 8/30/99 by Dr. Luplow. (Tr. 329). Dr. Luplow noted that her then-current medications were "Lortab prn, Naprosyn prn (and) Paxil." (Id.) He also noted that "She has been seeing Dr. Uskavitch, a neurologist, for her headaches."

During the reconsideration of her claim in September 1999, DDS asked Ms. Rutherford to again fill out Pain and Activities of Daily Living Questionnaires. (Tr. 108-118). When completing the Pain Questionnaire on 9/18/99, Ms. Rutherford noted that her "headaches began in October last year. Muscle weaknesses began after that in about Feb. or March this year." (Tr. 108). She wrote that her pain was located "in my head, legs, arms, wrists, neck." She further described her pain and other symptoms as follows:

> The leg cramps are in my hips and upper part of my leg,
> and sometimes in my feet and ankles, in my arms, the
> pain is around the lower part of my arm.
> And in my wrist the pain makes me drop things like they
> are giving up, my neck always feels like it is tired
> all the time. The headaches are in one area most all
> the time. Dizzy a lot of the time.
>
> . . . Headaches are constant. The others are off and on
> depending on when they want to.
>
> . . . The headaches have lasted almost a year now. The

others last sometimes hours – sometimes days or weeks.

. . . The headaches are severe and constant. They make me take naps to help with the pain. Sometimes about once a month they are so severe I have to go to bed and stay there for weeks. I get dizzy a lot and can't do normal things because of the headaches and dizziness and my muscles acting up. My memory is getting worse each time the headaches get stronger.

(Tr. 108-10). She noted that she did not have a new pain medicine prescription "since I last filed." (Tr. 109). To relieve the pain, she did or used "hot baths, cold baths, hot pad, cold packs, different muscle rubs like Icy-Hot." (Tr. 110). In describing her current daily activities, she wrote:

All of these (walking, shopping, household chores, driving, socializing, *etc.*) are hard because of the headaches, muscle aches and dizziness. Most of the time I just stay home and if possible send someone else to go do it or have someone else to drive me because I am afraid I will pass out again and kill myself or someone else.

(Tr. 110) To the question "Are there any other statements you wish to make about the pain?" she wrote: "If anyone knows how to stop these headaches and dizziness. Let me know what to do." (Tr. 111).

Ms. Rutherford also completed the ADL Questionnaire on 9/18/99. The directions at the top of this questionnaire read as follows:

You have indicated on the application for disability that you have the following conditions: Memory loss. In order to better understand your condition, please answer the following questions.

(Tr. 112). She wrote that her life had changed because of her

18

condition because "I can't remember things like I used to. And it makes it hard for everyday living." (Id.) Her eating habits had been affected because "Can't remember how to cook a meal so I use microwave food." (Tr. 113). To the question "Do you hear, smell or see things that later do not appear to have been there?" she reported "Yes" and wrote "When I get dizzy or out of the corner of my eye." (Id.) Her sleeping habits had changed because it was "Hard to get to sleep and stay asleep because of headaches and dizziness. Have to take naps." (Id.) To the question "Do your circumstances every seem hopeless?" she wrote "All the time." (Id.) In response to other questions in the Questionnaire, Ms. Rutherford wrote that she went outside of her home "once every week or so"; does not like to drive but would when she had no other choice; sometimes needed help walking because of her dizziness; cooked "rarely mabey (sic) once a month or so"; could not remember how to cook things or how to use some things; her household chores were limited to "feed animals, sometimes wipe off things. Light things"; had trouble remembering when to do and how to do her chores, and so "most of the chores are done by kids because I can't remember how to do them"; needed help shopping because "can't remember what to get"; and as "more time goes by the harder it gets to do things. I get tired easy." (Tr. 114–15).

On 9/28/99, DDS consultant Denise Bell, M.D. completed a Physical Residual Functional Capacity Assessment (PRFCA) form.

19

(Tr. 221 – 228). Dr. Bell indicated that Ms. Rutherford's

"primary diagnosis" was "MS," but she did not list any secondary

diagnoses. She opined that Ms. Rutherford could occasionally

lift/carry 50 lbs., frequently lift/carry 25 lbs., stand or walk

about 6 hours, sit about 6 hours, and that she had no

pushing/pulling, postural, manipulative, visual, communicative,

or environmental limitations. (Id.) Dr. Bell's explanation "How

and why the evidence supports (her) conclusions" reads as

follows:

```
[Title XVI]
MS migraines.
ER headache 5-99 normal neuro.
Consultative examination 6-7-99. Normal gait 5/5.
20/20.
Gale – Homeschools her 3 children. Washes dishes.
[] Naps during day.
[] not relieved pain ↓ lift from 100/50 to 50/25.
```

(Tr. 222–23) To the question "Are there treating/examining source

conclusions about the claimant's limitations or restrictions

which are significantly different from your findings?", Dr. Bell

checked "Yes." (Tr. 227). Her explanation "why those conclusions

(of the treating/examining source) are not supported by the

evidence in the file" reads as follows:  "Dr. Keown – normal

neuro. ADL's." (Id.)

On 9/29/99, another DDS psychologist, Larry Welch, Ed.D.,

completed a "Psychiatric Review Technique" form. (Tr. 203–11).

Like the first DDS physician, Dr. Edwards, Dr. Welch opined that

Ms. Rutherford's mental conditions were "not severe." (Tr. 203).

20

Dr. Welch identified her condition as an affective disorder not otherwise specified versus secondary to a general medical condition. (Tr. 206). Dr. Welch's discussion of the evidence reads as follows:

> Recon of initial psychiatric review 7/99. No new or worsening psychiatric symptoms. No psychiatric treatment. ADLs: Recon ADLs described full, independent lifestyle. Psychiatric Perspective: Psychiatric remains non-severe.

(Tr. 204) Dr. Welch opined that she had no restriction of her ADLs and never experienced an episode of deterioration or decompensation in a work or work-like setting, seldom had deficiencies of concentration, persistence or pace, and had only slight difficulties in maintaining social functioning. (Tr. 21).

On 2/14/00, Dr. Uskavitch again saw Mr. Rutherford for a follow-up neurologic evaluation. His 2/14/00 letter to Dr. Luplow reads, in relevant part, as follows:

> She has a chronic daily headache. She takes several doses of acetaminophen each day and I suspect that this is an analgesia rebound headache. Her headaches have no chance of improving unless she completely stops the use of over-the-counter analgesics. My attempts at headache stabilization with various medications have not been of benefit. Her clinical examination shows no progressive or focal neurologic abnormality. As you know, a previous MRI scan suggested a demyelinating process. In the absence of progressive neurologic impairment or clear-cut attacks, I will defer follow up MRI examination for the time being. Her clinical examination is unchanged. Her affect is depressed.

(Tr. 229)

On 4/3/00, Dr. Uskavitch completed a "Medical Source

21

Statement of Ability to do Work-Related Activities (Physical)"
form for SSA. (Tr. 231–33). Dr. Uskavitch noted no lifting,
carrying, standing, walking, sitting, pushing, pulling,
manipulative, or visual/communicative limitations. (Id.) He
limited her to only occasional postural activities, and also
limited her exposure to temperature extremes and
humidity/wetness. (Id.)

On 5/8/00, Dr. Luplow treated Ms. Rutherford for dysuria,
menorrhagia ("menstrual bleeding for three weeks") and "right
hand pain after hitting a dog." (Tr. 328).

Ms. Rutherford was treated on 9/1/00 at the Goodlark Medical
Center ER for "pain right 5th toe – struck against wall." (Tr.
235).

By referral of Dr. Uskavitch, Ms. Rutherford was examined by
Harold Moses, Jr., M.D., Assistant Professor of Neurology at
Vanderbilt University Medical School, on 9/7/00 "for another
opinion as to whether or not she could have underlying
inflammatory demyelinating disease." (Tr. 350 – 355). Dr. Moses
recorded her description of her problems as follows:

> . . .(her) symptoms are characterized primarily by
> dizziness. She states that if she watches objects pass
> in her visual field or she stands up quickly, she can
> feel dizzy and even pass out from time to time. These
> spells go on for up to 15 minutes ta a time. These
> symptoms have been fairly persistent along with
> significant headaches since approximately two-and-a-
> half years ago. She states that prior to that she had
> done well. She describes a pulsatile sensation at the
> back of her head. She states that it is always present,

22

and it is made worse by stress. She has taken nothing
for her headaches in the past, apparently because of
concerns with regard to rebound headaches.

. . .

*Review of Systems:* Demonstrates some weight loss in the
last six  months, some cold intolerance,
blurred vision, again headache pain as well as muscle
pain in her neck, difficulties falling and staying
asleep, occasional falls, difficulties with memory,
particularly confusion, dizziness, changes in her bowel
movements and leaking urine. The remainder of her
review of systems is unremarkable.

(Tr. 350-51). Dr. Moses noted that she had "used a number of

medications both for her headache as well as the dizziness

including Paxil, Antivert, Depakote, Elavil, Medrol Dosepak,

Lorazepam and Xanax," and that "None of these have been

particularly helpful." (Tr. 350).

Dr. Moses' neurologic exam findings were entirely

normal/unremarkable (Tr. 351, 354). His impression was that he

did "not believe that Ms. Rutherford's symptoms, history and

neurological examination are consistent with inflammatory

demyelinating disease." (Id.) He recommended a repeat MRI; that

she see a headache specialist; checking her B12 or folate;

Ditropan 5 mg p.o. t.i.d., to see if that may not help with some

of her bladder symptoms; and that "Steroids may be of some

benefit with regard to her headaches, but I do not think that

they would necessarily be of much benefit for her underlying

changes on MRI." (Tr. 351–52). Dr. Moses "wonder(ed) if she may

23

have had a previous insult that would explain some of those changes, or she may even have subclinical MS, and if that is indeed the case, she is likely to do quite well for some time." (Tr. 352).

At the hearing before the ALJ on 10/4/00, Ms. Rutherford was asked to describe her symptoms, ADLs, home-schooling of her children, social life, *etc.* (Tr. 713-22). She stated that she had headaches "all the time," and that they varied in intensity. (Tr. 714). With her least severe headaches, she could "pretty much get up and do the things I need to do. As far as house work or anything like that, like sweeping or something like that, but with the more severe ones, and the harder ones, I have to lie in the bed with my head covered up." (Tr. 715). The more severe headaches occurred at least once or twice a week. (Id.) These headaches caused her to stop teaching her children and lie down at least twice a week. (Tr. 717). When this happens, her "oldest daughter knows to automatically take over." (Id.) When her headaches were so severe that she had to lie down, it was "usually for the rest of the night." (Id.) Her oldest daughter would help the two younger children with their school work. (Tr. 715). Ms. Rutherford's mother also helped to teach the children, usually by telephone, sometimes by actually coming to the house. (Tr. 715-16). When asked about her other symptoms, Ms. Rutherford responded "Just weakness. Just feel real tired all the time."

24

(Tr. 721). This started "pretty much" about the same time as the headaches started. (Id.) Before then she was "pretty active when we went, did all kinds of activities and things. I just got depressed, so tired I can't go." (Id.) When asked to describe any altered sensation she experienced in her body, Ms. Rutherford responded:

> In my legs like from my knees down and in my hands, sometimes, if I am holding something, sometimes my hands just let it go. And it just feels like I've got needles pumping in my arms and my hand my (sic) and my feet.

(Id.) When asked why she did not think she could perform even simple unskilled work, she stated that employers would probably fire her "because I wouldn't be able to show up every day." (Tr. 722).

Ms. Rutherford's mother, Rosalind Canada, also testified at the 10/4/00 hearing. (Tr. 722–26). Ms. Canada was asked to describe her daughter before "this headache syndrome started." (Tr. 723). She stated that Ms. Rutherford was a cheerleader in school, took baton lessons for 5 or 6 years, was active in sports at school, and was "really active with her children, who are, you know, obviously close in age, playing with them and going to the park and all those type things. So she was real active." (Id.) She described the headaches as progressively worsening over time. (Tr. 723–24). When asked for her "observations of how she (Ms. Rutherford) is doing currently," Ms. Canada testified:

25

> I would say when she is not in severe pain, she would
> be interacting with the children, with their school
> work, or she would be in the process of some household
> chore. She would maybe drive to my office or drive to
> my home. Maybe drive to her sister's home. But when the
> headaches occur, then usually, Mandy calls me right
> away, and she says 'Mom's in bed again.' And how do I
> do this, or how do I do that.

(Tr. 724). Ms. Canada received such phone calls from Amanda

"Probably 2, 3 times a week. Just as a average." (Id.) When asked

to describe her daughter's mood in the past couple of years,

Ms. Canada testified:

> I'd say that she is, when she is not in severe pain,
> she's usually in pretty good, has pretty good moods.
> When she's in pain, then she's short-tempered, she's, I
> suppose for lack of a better word, grumpy. Just kind of
> takes an attitude of leave me alone. Just don't bother
> me at all. And, you know, I really don't know exactly
> how to say what I'm saying, what I'm trying to say.

(Tr. 725)

On 11/15/00, Ms. Rutherford underwent yet another

"neurological second opinion," this time by Richard T. Hoos,

M.D., Associate Professor of Clinical Neurology at Vanderbilt.

(Tr. 346-47). He recorded her description of her problems as

follows:

> . . .she is a 32-year old woman with a 2-year history
> of left parietal head pain. Discomfort is frequently
> severe enough to send her to bed, where she stayed once
> for a month. With some headaches she has nausea and
> phonophotophobia. She denies stress, but recognizes
> that being startled or the need to concentrate
> aggravates her headache immediately. She gets dizzy
> when she stands up after being asleep. . .

> . . .

26

> Her past medical history includes asthma, depression,
> anxiety and fainting spells. . .

> . . .

> Her review of systems, as documented on her history
> form, includes alternating constipation and diarrhea,
> urinary frequency, a urinary tract infection last year,
> 20 pound weight loss last year, five pound gain this
> year, insomnia, fatigue, anorexia, decreased energy,
> mood swings, crying spells and irritability.

(Tr. 346)

Regarding Ms. Rutherford's prescription medication history, Dr.

Hoos wrote as follows:

> Dr. Uskavitch discontinued all the analgesics she was
> taking last year, with little improvement. She has
> taken Paxil, Depakote, amitriptyline and Antivert
> without benefit. She did not take enough amitriptyline to improve her

(Id.) Her then-current medications were Indocin and Klonopin,

"both just since November 10, 2000, and so far without benefit."

(Id.) Dr. Hoos' examination findings were normal/unremarkable

except that he found "mild psychomotor retardation," "at times

her left eyelid droops, but at others they are quite

symmetrical," and "pinprick is perceived as less sharp over the

left leg and arm." (Tr. 346-47). Dr. Hoos' impression was that

her "symptoms are most suggestive of tension-type headache in the

context of significant depression." (Tr. 347). His

recommendations read as follows:

> The trial of Indocin and Klonopin was appropriate,
> especially for the unlikely possibility of paroxysmal
> hemicrania, as was the attention to possible analgesic
> rebound, and trials of preventives. I would recommend
> first another trial of amitriptyline at a dose which

27

allowed good quality sleep, for at least six weeks. If
not successful, then trials of other SSRIs, and other
non-tricyclics, directed primarily at depression, would
be appropriate. I have had at least one patient with
multiple sclerosis who presented in this way with
atypical head pain, without definite signs suggestive
of demyelination, so I agree with continuing to keep
that possibility in mind. I did, however, suggest that
smoking was a more likely cause of her abnormal scan,
and encouraged her to stop, no matter what the
diagnosis turns out to be. She will return to Dr.
Uskavitch for followup. . . .

(Tr. 347).

Ms. Rutherford had another MRI of the brain on 11/15/00, and

the radiologist's "Impression" reads as follows:

1)   Subcortical and central white matter changes which
     appear to be stable in number compared to the exam
     of 10/30/98 with no new lesions identified. Some
     of the foci are slightly more conspicuous which is
     likely technically related. There is no evidence
     for abnormal enhancement.

2)   Focus of increased signal within the right strium
     on the diffusion study likely related to the
     corroid plexus, possibly representing a very small
     corroid plexus cyst.

(Tr. 348-49).

On 1/27/01, Ms. Rutherford was again seen at the Horizon ER

for a severe headache, which she described as having "Lasted for

2 years gets intermittently worse. Says that it got worse

tonight, with nausea/vomiting." (Tr. 586-89). She was diagnosed

with otitis media and migraine cephalgia, and prescribed Keflex

and Sudafed. (Id.)

Ms. Rutherford was back at the Horizon ER the very next day,

1/28/01, complaining of dizziness. (Tr. 590-99). She reported

28

that she was "Trying to put out the fire this morning and was exposed to smoke. Denies passing out, no headache, paresthesias nor chest pain." (Tr. 590). She was diagnosed with a smoke inhalation injury and burns to her face. (Tr. 591).

On three dates in February 2001 (2/19/01, 2/20/01 and 2/27/01), Ms. Rutherford underwent a full psychological evaluation by Kathleen M. Kaminsky, M.S. and Patti van Eyes, Ph.D. at the Vanderbilt Department of Psychology and Human Development. (Tr. 357-66). For the first time, Ms. Rutherford was administered a battery of cognitive and psychological tests. (Tr. 360, 362) Dr. van Eys and Ms. Kaminski also took a very extensive history from Ms. Rutherford, and reviewed her treatment records, which had been provided to them. (Tr. 357-65). They described Ms. Rutherford as "quite irritable" at the outset of the diagnostic interview, and "reluctant to discuss her psychological health as she felt that no one understood what her life was like. She had brought a journal page with her, which she wanted to take the place of the formal interview." (Tr. 362). However, after the importance of the interview was explained to her, she cooperated fully. (Id.) In similar fashion, Ms. Rutherford "denie(d) being able to share her emotional distress in any depth" with the close friend who had driven her to and from her appointments at Vanderbilt. (Tr. 364). Dr. van Eyes and Ms. Kaminski made a detailed record of Ms. Rutherford's description of her problems

Case 3:06-cv-00483   Document 30   Filed 04/21/08   Page 29 of 52 PageID #: 214

and the results of tests administered, from which they concluded that Ms. Rutherford suffered multiple marked limitations of mental functioning; that she had experienced multiple episodes of decompensation manifested as headaches; that she was suffering from Major Depressive Disorder (chronic, severe), Generalized Anxiety Disorder, Social Phobia, Simple Phobia, Probable Multiple Sclerosis, and Chronic Headache, with the need to rule out a psychotic disorder; and, that her global ability to function psychologically was seriously impaired. (Tr. 357-68)

On 4/27/01, Ms. Rutherford was seen at the Horizon ER. (Tr. 604-09). The "Chief Complaint" section of the ER note reads as follows:

*Chief Complaint:* 33 year old white female presents with a history of feeling depressed and being (in) chronic pain from abscessed tooth. She was diagnosed with MS about 2 years ago. She has had some suicidal thoughts but has not attempted. She says since an 8 month old child (who was her deceased friend's child) was taken away from her.

(Tr. 604). She was diagnosed with "Depression."

On 5/11/01, Ms. Rutherford was treated at the Horizon ER for a toothache, and prescribed Lortab. (Tr. 610-11).

On 8/17/01, Ms. Rutherford presented to the Centerstone Community Mental Health Centers seeking treatment for her mental problems. (Tr. 466-77). Leslie Rice, LCSW, recorded Ms. Rutherford's "Presenting Complaint" as follows:

*General Information:*
1. Consumer's present complaint:

30

> Depression, anxiety, easily overwhelmed, inability to
> cope with day-to-day events.
>
> Unable to work - hasn't worked since 1986 - for one
> week. Scared to drive. Scared to go in stores, not
> sleeping, not eating: over 3 years. Hears things that
> aren't there. Sounds like doors slamming. Sometimes
> sounds like voices; people shouting - hears a whining
> noise in her head.
>
> Some suicidal thoughts periodically - no real plan.
>
> No energy to do anything. Easily agitated with kids -
> starts yelling, "shut up."
>
> Feels hopeless, overwhelmed, doesn't want to get up or
> do anything - can get up to walk dog.
>
> Afraid to be around people - they push and grab at her
> - laugh at her - feels people are talking about her -
> whispering about her. Feels like there are people out
> to get her – kid's father and his friends. Three kids:
> 12, 13, 14.
>
> Severe migraines - confined to bed.
>
> Anxiety - starts shaking, gets dizzy, can't breathe,
> itch all over - hits out of nowhere. No specific
> trigger.

(Tr. 467–68)

Ms. Rice performed a Mental Status Exam, and found Ms. Rutherford's predominant mood to be dysphoric and fearful; her affect to be blunted; her attention/concentration to be moderately impaired; and both her short term and long term memory to be impaired. (Tr. 471). Ms. Rice also found her thought form/content to include "Delusions - Paranoia" and "Hallucinations – Auditory General." (Id.) Ms. Rutherford's medications at that time were noted to be Verapamil, Clonazepam

31

and Paxil. (Tr. 473). Ms. Rice recorded Ms. Rutherford's height and weight as 5' 3" and 87 lbs., respectively. (Tr. 472). She diagnosed major depressive disorder, severe, chronic; generalized anxiety disorder; and social phobia. (Tr. 466). She noted Ms. Rutherford's "Problem Duration" to be "2 years and over." (Tr. 469). Ms. Rice found Ms. Rutherford's Global Assessment of Functioning (GAF) scale scores to be 40 currently, a highest of 45 in the past 6 months, and a lowest of 40 in the past 6 months. (Tr. 466). She recommended a psychiatric evaluation, case management and therapy. (Id.)

Ms. Rice completed a functional assessment form in which she assessed Ms. Rutherford as severely impaired for at least 6 months or longer of the preceding year. (Tr. 476-77).

On 8/27/01, Ms. Rutherford was again treated at Horizon ER for a severe headache. (Tr. 612-14). This headache had lasted for two days and was associated with photophobia, nausea and vomiting. (Tr. 612). Ms. Rutherford's "Past Medical History" was noted to be "depression, psychosis, migraines." (Id.) She was diagnosed with a headache and prescribed Lortab. (Tr. 613-14).

On 8/28/01, Ms. Rutherford underwent a psychiatric evaluation by Dr. Pavuluri at Southridge Psychological/Harriet Cohn Center. (Tr. 463-65). Ms. Rutherford reported "that she has been depressed for past 3 years," and that she had a "history of physical and sexual abuse towards her as kid but she

32

was able to live fair life 'til 3 years ago." (<u>Id.</u>) Since then she had been "feeling sad and has low energy level." (<u>Id.</u>) She had been getting "worse for last 3 months" and she was "unable to get up from her bed to do ADL's." (<u>Id.</u>) Dr. Pavuluri observed her to be "very drowsy," her mood to be dysphoric, and her affect dull. (<u>Id.</u>) Dr. Pavuluri diagnosed major depression with psychosis and chronic headache. (<u>Id.</u>). Because she was "unable to tolerate Paxil," Dr. Pavuluri switched her to Celexa. (<u>Id.</u>).

On 9/5/01, Ms. Rutherford presented as a new patient at the office of Pam Singer, D.O. (Tr. 491). Dr. Singer's 9/5/01 clinic note reads, in relevant part, as follows:

> *Subjective:* . . . She's on Verapamil 120 and h.s. as well as Klonopin h.s. and that doesn't seem to have made a difference. She has daily headaches. She takes no caffeine whatsoever, but so far nothing has been able to take care of her symptoms. Patient also has asthma and she takes an Albuterol Inhaler and a Vanceril Inhaler. . . . She's recently been changed from Paxil to Celexa and although it helps the anxiety she says she still feels very depressed. She's had this depression for a long time. . . .

> *Objective:* Well-developed, thin, 30-year-old white female who appears to be in no acute distress. She speaks very slowly, deliberately and frequently seems to pause and can't remember where she's going next. She seems almost obtunded. She brought her dog with her today and frequently has interaction with her dog that seems to be somewhat inappropriate, talking to him as though he were a person and makes comments that the dog knows what her illnesses are by smelling her breath and can tell when she's upset by something and can tell that she has stomach trouble.

33

*Assessment:*    Asthma.
                 Chronic daily headache.
                 Odd behavior.

*Plan:* Patient is encouraged to get back in touch with her counselor as well as her psychiatrist. I tried her on some Zomig today to see if I could help the headache. She was given 2.5 but really noticed no improvement with the headache after 30 minutes. Will get her back in to see her neurologist. She would like to see a different neurologist. Followup for physical. Given refills on her Albuterol and her Vanceril.

(Tr. 491).

On the next day, 9/6/01, Ms. Rutherford presented to Centerstone without an appointment stating that she had "not slept/eaten for one week." (Tr. 460). She had "Called 1-800-SUICIDE last night with no response," and was experiencing suicidal ideation. (Id.) The nurse who saw her described her as "disheveled, shaking . . . crying," and wrote that she "has been physically abused. Mobile Crime called." (Id.) She was then seen for an emergency psychiatric evaluation. (Tr. 459). The psychiatrist filled out the "6-104" papers (*i.e.*, involuntary commitment papers) and Ms. Rutherford was transported to Summit Medical Center, where she was hospitalized from 9/6/01 to 9/11/01. (Tr. 459, 416–20). She was treated by Mohammad S. Jahan, M.D. (Tr. 416–20). Dr. Jahan performed a psychiatric evaluation on 9/6/01, and his "Initial Impression" reads as follows:

*Initial Impression:*

Axis I:     Major depressive disorder, single episode,
            severe with psychotic feature. Rule out mood
            disorder secondary to general medical

34

condition with psychotic feature. Rule out
                    schizophrenia.

        Axis II:    No diagnosis.

        Axis III:   Muscular (sic) sclerosis.
                    Migraine type of headache.

        Axis IV:    Severe. Poor relation with her boy friend and
                    14-year-old daughter. Also, one son being in
                    DHS custody. Financial problem.

        Axis V:     Current Global Assessment of Functioning
                    Scale on Admission 35. Past Year Global
                    Assessment Of Functioning Scale 55.

(Tr. 417–18) Dr. Jahad's Psychiatric Discharge Summary for

9/11/01 reveals his "Final Diagnosis" to be essentially unchanged

from his assessment upon admission, except that the Axis I "rule-

out" diagnoses had been eliminated, and no current GAF was

assessed.  (Tr. 416).

        Ms. Rutherford was again hospitalized for psychosis,

suicidal ideation and severe depression from 1/24/02 to 1/28/02.

(Tr. 432–37, 616–17). At discharge, her diagnosis was given as

"post-traumatic stress disorder" (on Axis I) and "dependent

features" (on Axis II).  (Tr. 432).

        The ALJ, through DDS, referred Ms. Rutherford for a

consultative neurological evaluation by Martin H. Wagner, M.D. on

11/22/02. (Tr. 484–87). Ms. Rutherford described her "chronic

daily headaches" as "bifrontal and bioccipital pressure pain"

which "at times. . .is a global headache." (Tr. 484). She was

taking "daily Ketorolac 10 mg and also promethazine 25 mg 1 – 2

                                35

daily. . .without benefit." (Id.) In addition to these headaches she also had "episodic migraines" which she "described as pulsative, hemicranial headaches with associated nausea, photophobia and phonophobia and are often preceded by visual scotoma and jagged lines." (Id.) On mental status exam, Dr. Wagner found "she is lethargic appearing with a flat affect and is oriented times 4. She has a gaping mouth with significant psychomotor retardation." (Tr. 486). Dr. Wagner's neurological exam was essentially normal/unremarkable. (Id.) His "Impression" was that plaintiff was cognitively impaired; he suspected this impairment was chronic and related to mental retardation versus dementia. (Id.)

### III.  Conclusions of Law

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Sec'y of Health & Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).

36

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Comm'r of Soc. Sec., 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Sec'y of Health & Human Servs., 753 F.2d 517, 519 (6th Cir. 1985).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

37

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[1] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination.

---

[1]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

Id.  In such cases where the grids do not direct a conclusion as
to the claimant's disability, the Commissioner must rebut the
claimant's prima facie case by coming forward with particularized
proof of the claimant's individual vocational qualifications to
perform specific jobs, which is typically obtained through
vocational expert (VE) testimony.  See Varley v. Sec'y of Health
& Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for
purposes of the analysis required at steps four and five above,
the Commissioner is required to consider the combined effect of
all the claimant's impairments, mental and physical, exertional
and nonexertional, severe and nonsevere.  See 42 U.S.C. §
423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in failing to issue a
fully favorable decision, particularly inasmuch as he
misperceived her chronic headaches as merely "associated with
analgesic rebound" or otherwise less deserving of weight because
they were related to her psychological impairment.  (Tr. 25)
Plaintiff has taken issue with much of the ALJ's reasoning over
the sixty pages of her brief, but, in the undersigned's view, it
suffices to say that the outcome of this case is directed by the
singular failure of the ALJ to properly consider the
uncontradicted evidence of plaintiff's most significant problem

39

prior to September 2001, her headache syndrome, combined with the
expert testimony that the associated rate of expected absenteeism
would be an insurmountable obstacle to employment.  Indeed, the
following paragraphs are the only portions of the ALJ's narrative
which reveal his analysis of the source and significance of
plaintiff's pre-September 2001 nonexertional, subjective
complaints, as testified to by plaintiff and her mother:

> The claimant testified that she was teaching her 3
> children at home in 1999 but was not able to do much
> with them due to headaches.  In 1999, her children took
> care of themselves when she had a migraine or called
> their grandmother a lot, and a neighbor also helped.
> ...  Her mother testified that she helped the children
> with lesson assignments when they were taught at home.
> Ms. Canada stated that shortly before September 2001,
> the claimant began having more severe panic attacks due
> to an accumulation of situational and financial
> problems.
>
> The record as a whole does not support limitations of
> function prior to September 2001, including pain, which
> would have prevented unskilled, medium work activity.
> The claimant experienced headaches described as
> tension-type and vascular-type.  These daily headaches
> were associated with analgesic rebound.  It was stated
> that there was no chance of improvement unless the
> claimant completely stopped the use of over-the-counter
> analgesics.  The description of headaches in June 1999
> was inconsistent with common or classical migraine.  At
> an examination by Dr. Hoos in November 2000, symptoms
> were most suggestive of tension-type headache in the
> context of depression.  In February 2001, headaches
> were described as exacerbated in times of psychological
> stress.
>
> * * *
>
> Prior to September 2001, there was no treatment for any
> psychological distress.  The claimant was able to
> successfully perform as a home school teacher for her 3
> children, which included gathering and organizing

curriculum and teaching her children. As of June 1999,
the claimant did not meet the criteria for major
depression. There was only episodic cognitive
dyscontrol and memory loss. She was able to shop for
groceries, maintain a checking account, and pay bills.
In November 2000, although there was mild psychomotor
retardation, speech, language, memory, and cognition
were normal. When hospitalized in September 2001 and
January 2002, the Global Assessments of Functioning for
the past year were 55 to 60, which indicates moderate
symptoms or moderate difficulty in social or
occupational functioning.

(Tr. 25-26)

As plaintiff points out, this treatment of plaintiff's

primary problem is insufficient on a number of fronts. The ALJ

appears to suggest that because plaintiff's headaches eluded a

unifying diagnosis, having been characterized as tension-type,

vascular-type, rebound, and stress-related, the testimony to

their effects is somehow less credible. The ALJ also appears to

suggest, less than clearly, that there is some damaging

inconsistency between plaintiff's physicians' finding of

headaches in the context of significant depression, and

plaintiff's failure to seek psychological care prior to September

2001, coupled with the relatively benign findings of the one-time

psychological examiner, Dr. Gale, in his June 1999 report (Tr.

197-201). However, as further explained below, these suggestions

are insufficient in light of the otherwise strong proof of

disability in this case.

As an initial matter, it is apparent from the proof that

plaintiff suffers from two types of headache, one of which occurs

41

daily and is characterized by "a pulsatile sensation at the back of her head ... [that] is always present, and ... is made worse by stress" (Tr. 350), and one of which occurs episodically and has been recognized by plaintiff's treating neurologist and the ALJ himself (Tr. 21, 28) as a migraine,[2] characterized by intense left-sided pain and accompanied at times by visual symptoms, dizziness, and memory loss. The testimony of both plaintiff and her mother at the October 2000 hearing verified that the more severe migraine headaches occurred roughly twice a week (Tr. 715, 724). Plaintiff also testified that on days when she was without migraine pain, her headache would intensify with increased activity and the need to concentrate on her children's schoolwork, but that she still managed to accomplish what she needed to in terms of housekeeping and homeschooling, whereas the days when she suffered a migraine headache were spent in bed with her head covered (Tr. 715, 717).

While plaintiff's description of her migraine symptoms to

---

[2]From the Greek word for "an affection of half of the head," migraine is defined as:

an often familial symptom complex of periodic attacks of vascular headache, usually temporal and unilateral in onset, commonly associated with irritability, nausea, vomiting, constipation or diarrhea, and often photophobia. Attacks are preceded by constriction of the cranial arteries, often with resultant prodromal sensory (especially ocular) symptoms and the spreading depression of Leão; the migraines themselves commence with the vasodilation that follows. Two primary types are distinguished, *m. with aura* [(classic migraine)] and *m. without aura* [(common migraine)]; the variety without an aura is more common.

Dorland's Illustrated Medical Dictionary 1042-43 (28th ed. 1994).

42

the government-employed consultant, Dr. Keown, may not have fit the criteria for either classic or common migraine, this report alone is insignificant when considered against the consistent diagnosis of migraine headaches by at least three specialists on this record, and a corresponding record of attempts at symptom relief utilizing several classes of medications. It is noteworthy here that the Sixth Circuit has affirmed the denial of a similar claim to benefits on the basis that the "[c]laimant did not introduce objective medical evidence to support the existence or severity of the alleged migraine headaches," but relied solely upon her own incredible testimony to establish a disabling level of headache pain. McCormick v. Sec'y of Health & Human Servs., 861 F.2d 998, 1003 (6th Cir. 1988). The district court decision which was affirmed in McCormick emphasized that while migraine headaches "are not traced easily to an objective medical condition," the claimant's case was nonetheless undermined by a medical record which was lacking in support for the level of pain alleged, and which indeed showed that the claimant failed to seek medical attention even once during a six-month trip to Florida, and that her physicians confirmed their success in relieving her headaches through the use of prescribed medications. McCormick v. Sec'y of Health & Human Servs., 666 F.Supp. 121, 123 (E.D. Mich. 1987). The decisions in Ms. McCormick's case applied the then-newly articulated standard for adjudicating disability

43

claims based on pain, which has since been construed in harmony

with the Commissioner's regulations[3] and has become an eminently

familiar citation in cases from this circuit:

> First, we examine whether there is objective medical
> evidence of an underlying medical condition.  If there
> is, we then examine: (1) whether objective medical
> evidence confirms the severity of the alleged pain
> arising from the condition; or (2) whether the
> objectively established medical condition is of such a
> severity that it can reasonably be expected to produce
> the alleged disabling pain.

Duncan v. Sec'y of Health & Human Servs., 801 F.2d 847, 853 (6th

Cir. 1986).

As alluded to above, the medical record in this case is far

more supportive of plaintiff's claims than the record made in

McCormick.  The genesis of plaintiff's head pain is unclear,

though the record documents a motor vehicle accident in November

1996 which resulted in plaintiff being transported by ambulance

to the emergency room with a head injury; plaintiff was

discharged with a soft collar and instructions to use nothing but

Tylenol or ibuprofen for her headache.  (Tr. 165-66).  By October

1998, plaintiff "ha[d] evolved a chronic daily headache pattern

over the last three months" which had not been responsive to

nonsteroidal anti-inflammatories or narcotics, leading her to

consult a neurologist, Dr. Uskavitch, who noted that "[h]er past

---

[3]The Sixth Circuit in Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994),
found that the circuit's standard for analysis of pain complaints is simply "a
more succinct form" of the standard established in 20 C.F.R. § 404.1529,
entitled "How we evaluate symptoms, including pain." Id. at 1038-39.

44

medical history is significant for a concussion two years ago with no immediate neurologic sequela." (Tr. 132) Dr. Uskavitch noted plaintiff's concurrent report of dizziness, blurred vision, and intermittent numbness and parasthesias in the fingers and toes, though her neurologic exam was normal; he diagnosed "intractable migraine headache," ordered an MRI of plaintiff's head and an injection of medication in his office which relieved plaintiff's headache by eighty percent, and prescribed amitriptyline and Antivert to stabilize her headaches and vertigo, respectively. (Tr. 132-33)

     The results of plaintiff's MRI showed "diffuse demyelinating disease suggesting multiple sclerosis" (Tr. 130), a condition which would not typically be accompanied by the type of headaches plaintiff experiences (Tr. 129), though Dr. Hoos, another neurologist consulted for an opinion on plaintiff's headaches, stated that he had "had at least one patient with multiple sclerosis who presented in this way with atypical head pain, without definite signs suggestive of demyelination." (Tr. 347) Dr. Uskavitch continued to prescribe amitriptyline (Elavil) until it became apparent that plaintiff was seeing no benefit from this drug (Tr. 130-31). Dr. Uskavitch was concerned enough with the possibility of multiple sclerosis that he obtained a lumbar puncture to test plaintiff's spinal fluid for abnormalities, in addition to evoked potential studies and blood

Case 3:06-cv-00483  Document 30  Filed 04/21/08  Page 45 of 52 PageID #: 230

studies, all of which were essentially negative, prompting him to consult another neurologist, Dr. Moses, for an opinion on whether plaintiff could have an underlying inflammatory demyelinating disease (Tr. 350). Dr. Moses did not feel that any such disease was indicated, but suggested that plaintiff see a headache specialist for further treatment options, since she had seen no benefit from trials of amitriptyline, imipramine, doxepin, Depakote, or Paxil. (Tr. 350-51) Dr. Moses wondered if plaintiff did not have "an indomethacin-responsive headache," and further suggested steroids if the nonsteroidal medicines did not relieve her headache (Tr. 352). At the time of her visit with Dr. Moses in September 2000, plaintiff was taking nothing for her headaches "apparently because of concerns with regard to rebound headaches" (Tr. 350).[4] After adding indomethacin (Indocin) and Klonopin to the list of unsuccessful treatment options, plaintiff was seen by Dr. Hoos in November 2000. Though plaintiff had previously gotten no relief from the anti-depressant Paxil, Dr. Hoos recommended that the medical focus be placed again upon resolving her underlying depression in an effort to alleviate the suspected source of her tension headaches (Tr. 347). This recommendation proved fruitless, however, and by November 2002

---

[4]Plaintiff had been taking several doses of acetaminophen on a daily basis for an indeterminate period prior to February 2000, when she was advised by Dr. Uskavitch to "completely stop[] the use of over-the-counter analgesics." (Tr. 229)

46

the list of unsuccessful headache medications had grown to include verapamil, ketorolac, and promethazine (Tr. 484, 491).

In short, the medical record reveals the sudden onset of headaches that at best appear to have been burdensome to the performance of daily activities (particularly those requiring sustained concentration), and at worst required total inactivity and even treatment on multiple occasions in the emergency room. Some three months after the onset of these headaches, plaintiff consulted a neurologist who later confessed his inability to control plaintiff's symptoms after trials of several medications, and himself referred plaintiff to another neurologist specializing in the treatment of multiple sclerosis. Eventually a third neurologist was consulted by plaintiff's internist on the subject of plaintiff's headaches. Plaintiff's symptom complex during the period prior to September 2001 was dominated by her headache pain, with persisting secondary complaints (perhaps associated with subclinical multiple sclerosis (Tr. 352)) including dizziness and memory loss (Tr. 108-10, 112, 194, 197, 201, 350-51, 359), as well as the early stages of the depressive disorder that would ultimately prove disabling. While Dr. Uskavitch did opine on one occasion that the daily variety of headache suffered by plaintiff was caused by analgesic rebound (Tr. 229), plaintiff appears to have complied with his instructions to stop using acetaminophen (e.g., Tr. 346-47, 350-

47

52), to no avail.

The undersigned finds that the great weight of this medical record is opposed to the Commissioner's denial of benefits.  In his summary of the evidence, the ALJ failed to discuss the fruitless medical efforts to relieve plaintiff's headache pain and other indicia of her physicians' opinions regarding her prognosis.  In proceeding to note only the isolated references that, in his view, tended to undermine plaintiff's credibility -- i.e., that her headaches were precipitated and aggravated by psychological factors, and possibly caused by her misuse of over-the-counter analgesics -- the ALJ engaged in what can only be described as cherry-picking the medical record.  Rather than observing the divergence between his conclusion that "[t]he record as a whole does not support limitations of function prior to September 2001, including pain, which would have prevented unskilled, medium work activity" (Tr. 25) and Dr. Uskavitch's conclusion that all medical efforts to control plaintiff's headaches have failed (Tr. 229), the ALJ adopted Dr. Uskavitch's April 2000 RFC assessment (Tr. 231-33), which indicates only that plaintiff's nonexertional headache symptoms do not affect her exertional abilities, and is thus something of a red herring for these purposes.

While the ALJ's finding on the credibility of witnesses before him is entitled to significant deference on judicial

48

review, his explanation for discrediting a witness must nonetheless be reasonable and supported by substantial evidence. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). As detailed above, the ALJ's explanation by way of the medical proof is neither reasonable nor substantially supported. None of plaintiff's physicians questioned the veracity of her complaints in the least.

As to the other proof cited in support of the denial decision, the ALJ repeated Dr. Gale's 1999 report that "[t]he claimant was able to successfully perform as a home school teacher for her 3 children, which included gathering and organizing curriculum and teaching her children." (Tr. 26, 201) However, he did not cite this report to support his rejection of plaintiff's testimony (Tr. 715-17, 738) that her homeschooling efforts were severely limited by headaches. Rather, the ALJ mentioned plaintiff's successful performance as a teacher in discussing her mental capabilities, which was appropriate given that this was a "diagnostic impression" by the consulting psychologist, which was plainly drawn to exclude only psychological difficulties in performing these functions, since it immediately follows his recognition that "[h]er difficulties are reportedly, more physical in nature" (Tr. 201), and since Dr. Gale did not elsewhere discuss the impact of headaches on plaintiff's ability to perform as a home school teacher. The ALJ

49

likewise repeated the observation that plaintiff continued to homeschool her children in the course of rejecting the assessment of Dr. van Eys, a privately consulted psychologist (Tr. 26); however, though the ALJ addressed other physical symptoms in this portion of his narrative, he did not mention that Dr. van Eys made this notation regarding homeschooling as part of a background discussion of "family composition" (Tr. 357), and proceeded thereafter to relate the failed history of medical treatment for plaintiff's headaches, including the following report by plaintiff:

> She stated that the headaches can be so severe that she is unable to leave her bed so her daughters run the household. The length of these episodes can last from a few hours to several days. According to Ms. Rutherford, she spent the entire month of October 1998 in bed. In the past month, she has spent three full days in bed and has been incapacitated for several hours at a time on other occasions.

(Tr. 359).

Thus, while it is clear that the ALJ disbelieved plaintiff's testimony as to the frequency and severity of her head pain (even having earlier found, incorrectly, that her homeschooling efforts amounted to substantial gainful activity, Tr. 372-75), there is no offering of any real evidentiary support for this disbelief. The testimonial record made by plaintiff and her mother is, in the undersigned's view, entirely consistent with the medical evidence of plaintiff's constant complaints of head pain, with regular, recurring periods of migraine exacerbation that

50

effectively prevented plaintiff from performing anything in the way of work-related activities and required her mother and oldest daughter to stand in for her and direct the homeschooling endeavor. This pattern would translate into an unacceptable rate of absenteeism in the workplace, according to the unquestioned testimony of the vocational expert (Tr. 770).

Accordingly, upon this record of strong medical and testimonial proof of plaintiff's physical disability during a remote period leading up to her undisputed disability from impairments of mental functioning, the undersigned must conclude that there is no further factfinding to be had, and that remand for an award of benefits is in order. Such an award by the Court, while typically inappropriate out of deference to the expertise of the agency, may properly be made in cases such as this, where all essential factual issues have been resolved and plaintiff's entitlement is adequately established upon strong proof of disability, without significant proof to the contrary. E.g., Faucher v. Sec'y of Health & Human Servs., 17 F.3d 171, 173 (6th Cir. 1994); Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).


### IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record

51

be **GRANTED**, and that the decision of the Commissioner be **REVERSED** and the cause **REMANDED** for an immediate award of all supplemental security income benefits to which plaintiff is entitled based on her disability commencing October 1, 1998.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 21st day of April, 2008.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

52